UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| PHYLLIS KILGORE and husband, ) | |
| TERRY R. KILGORE ) | |
| ) | |
| V. ) | No. 2:02-CV-117 |
| ) | |
| CARSON PIRIE HOLDINGS, INC., d/b/a ) | |
| PROFFITT'S DEPARTMENT STORE, ) | |
| and KONE, INC., a/k/a MONTGOMERY ) | |
| KONE, INC. ) | |

## MEMORANDUM OPINION

This is a premises liability suit precipitated by a customer's fall while walking down a store's stationary escalator. The customer and her husband[1] filed suit against both the store which owned and operated the escalator [2], and the company with which the store contracted to service and maintain the escalator.[3]

Both defendants filed Motions for Summary Judgment. Kone's motion was granted previously, but the Court deferred ruling on Proffitt's motion. *See*, Memorandum and Order, Doc. 57. Proffitt's Motion for Summary Judgment is now ripe for determination. (Doc. 26).

---

[1] Hereafter, "plaintiffs"; the customer herself will be referred to by her name, Ms. Kilgore.

[2] Carson Pirie Holdings, Inc., referred to in the opinion by its common name, "Proffitt's."

[3] Kone, Inc., hereafter referred to as "Kone."

Summary judgment is proper only if there are no disputed issues of material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The opposing party must be indulged with any favorable inferences from the facts. *Plott v. Gen. Motors Corp.*, 71 F.3d 1190 (6th Cir. 1995). In this case, the salient facts are either undisputed or, where there is a dispute, plaintiffs' version is accepted as true.

On May 3, 2001, the defendant Carson Pirie Holdings, Inc., doing business as Proffitt's, owned and operated a department store in Kingsport, Tennessee. The store itself had at least two levels, and to transport patrons from one level to the other, the store had an elevator and an escalator.

According to their amended complaint, the plaintiffs allege the following: On May 3, 2001, Phyllis Kilgore was a business patron in Proffitt's store. Having entered on the second floor level, and wishing to go to the first floor, she went to the elevator. Noting that there was a large group of people waiting on that elevator, she elected to use the store's escalator. The escalator was not operating, i.e., it was stationary. Although she never before had walked down an inoperable escalator, she had observed others doing so, and she therefore proceeded to walk down. There was no barrier to prevent her from so doing, and no sign warning her not to walk down, or to use caution. As she walked down the escalator, she realized that the steps and risers created an optical illusion, but she decided that it would be safer to proceed to the

2

bottom rather than to attempt to turn and return to the top. She thereafter put her hand on the handrail and proceeded downward. Upon arriving at the bottom, the last step was "partially submerged into the escalator apparatus"; the "claws" of the last step caught the heel of her left foot, causing her to fall.

According to Carl Sexton, Proffitt's assistant manager, when an escalator stopped, Proffitt's personnel would first determine if it could be re-started. If not, it was "roped off" and the service company (Kone, Inc.) would be called. (Sexton depo., pp. 24, 52). The first notice Proffitt's personnel had that this escalator had stopped working was upon receiving notice that Mrs. Kilgore had fallen. (Sexton's depo., p. 16). After tending to Mrs. Kilgore, Sexton re-started the escalator. (*Id.*, at 75).

Plaintiffs' complaint alleges that Proffitt's and the manufacturer/installer of the escalator, Kone, Inc., were negligent by (1) failing to service and maintain the escalator in a reasonably safe condition, (2) failing to warn customers of any danger with regard to using the stationary escalator as a stairway, (3) failing to post a sign at the head of the escalator warning patrons not to use a stationary escalator as a stairway, and (4) failing to barricade the inoperable escalator.

In the intervening months since the filing of its Motion for Summary Judgment, the defendant Proffitt's has taken the discovery deposition of plaintiffs' expert, Albert Barnes, and has now supplemented its Motion for Summary Judgment [Doc. 68]. The Supplemental Motion for Summary Judgment primarily attacks the qualifications of

3

plaintiffs' expert and the bases for his opinions.

It is appropriate to note at this point that there is nothing in Mrs. Kilgore's pretrial discovery deposition that in any way contradicts the allegations set forth in her amended complaint; her deposition testimony merely elaborates on those allegations:

> Basically I started down the steps and was at a normal pace, and maybe part-way down the steps I realized that it wasn't like walking on stairs, that there was a difference in the width of the steps or the risers, and so I slowed down; sort of an optical illusion.
>
> . . . .
>
> [A]nyway, I was down enough steps 'til I thought about going back up because it was sort of an illusion created when I looked down, you know, at the, the risers sort of, or the edges of the steps go together. They weren't marked or anything. So I thought maybe, I had a thought quickly that maybe I should just back up and wait on the elevator. I had already started, so I just held to the rail and went on down the steps, but there was in my mind this is not like walking steps and I thought, you know, it's sort of confusing. And I certainly didn't think, you know, that there would be any problem going down, and using the steps, since there was no warning or nothing to tell me that I shouldn't do it and I had seen other people prior to that. So it was just, it was very confusing. I was just – so I, to be careful, I held to the rail to the bottom.
>
> . . . .
>
> When I got to the bottom I felt like as I, I started to step out and I thought well, I'm at the bottom and so I started to step out onto the landing and as I did, in just seconds I thought that my foot caught. I think, I think I even said that my left foot caught on that step.
>
> . . . .
>
> It sort of, I guess the difference in the, the, the risers, how they were. As I stepped out I sort of had a hard step and as I

4

> remember, I guess sort of a stumble and what I mean, the foot
> caught and actually was still on the step when I fell, so it caught
> and held. I mean I was, you know, the step was – I'm trying to
> think of the words. But anyway, it was, my foot was still there.
> It was still held, elevated in the air, and so . . . .

Mrs. Kilgore's deposition, pp. 57-59.

> [The escalator created] [s]ort of an illusion to me. Looking down
> I couldn't tell when it started out how far apart the steps were.
> They just looked like stairs and as I got down I realized my steps
> were getting closer together, I guess because of the way the
> escalator is made, and it was at that point I thought for safety
> reasons maybe I needed to go back up or – you know, you just
> have these quick thoughts, but in my mind I thought this is not
> like walking steps.

Mrs. Kilgore's deposition, p. 61.

> I, like I said again, in the word caught being that it was still
> suspended on the step and probably with that last step was sort of
> a, I remember hitting, you know, like you think it's higher and
> you take a step and it sort of throws you off balance. And so as I
> lost my balance the foot remained on that step in an awkward
> position and that's when it did the twist fracture.

Mrs. Kilgore's deposition, p. 64.

Reduced to its essence, the foregoing deposition testimony reveals that Mrs. Kilgore, after she had proceeded a short way down the escalator, noticed that it was difficult to ascertain where a step ended; or, to state it another way, where the drop-off to the next lower step began. As most of us have experienced in walking down stationary escalators, or even while using a moving escalator, the metal steps, viewed from above and from an acute angle, tend to visually merge. Notwithstanding her observation of this "optical illusion," Mrs. Kilgore elected to proceed on down, using

5

the handrail as she did so. As she reached the bottom of the escalator, either the last step was shorter than she expected, or perhaps longer; her testimony is not clear in this regard, but it is of no consequence. The difference in the height of that last step, coupled with the optical illusion discussed above, caused her to fall.

The plaintiffs retained Mr. Albert Barnes, an architect in Knoxville, as their expert witness. Mr. Barnes opines as follows:

1. When an escalator is stationary, it effectively becomes a stairway;

2. Stairways are governed by § 1007.3.4 of the Southern Standard Building Code, adopted by both the State of Tennessee and the City of Kingsport;

3. This section of the Southern Standard Building Code provides that the treads of stairways shall be of a uniform depth, and similarly the risers of that stairway will be of a uniform height;

4. When a stationary escalator is used as a stairway, the height of the riser at the bottom of the escalator is not uniform, and thus is violative of § 1007.3.4 of the Southern Standard Building Code;

5. It is "well known" that stairways with risers of unequal height present a safety hazard to those using the stairways;

6. Section 1007.3.4 of the Southern Standard Building Code applies to "stalled escalators [used] as stairs";

7. It is "well known" that escalators that are used as stairways create an illusion and create a state of confusion and disorientation;

8. Inasmuch as escalators do cease operating for various reasons, it is incumbent upon the owner to have an audible signal (such as a bell, whistle or horn) to warn the owner to barricade the escalator from public use;

6

> 9. It was incumbent on the owner of the escalator to place a sign at the entrance to it stating that it should not be used as a stairway in the event it is inoperable.

First, Mr. Barnes' opinion that a stalled escalator is immediately transmogrified into a stairway that is subject to § 1007.3.4 of the Southern Standard Building Code is untenable. An escalator is subject to the requirements set forth in Part 6 of the Safety Code for Elevators and Escalators of the American Society of Mechanical Engineers (ASME A17.1-1996), which is applicable in the state of Tennessee by virtue of the Rules of the Tennessee Department of Labor and Workforce Development, Chapter 0800-3-4. An escalator could not possibly comply with Chapter 6 of ASME A17.1 while operating, and also comply with § 1007.3.4 of the Southern Standard Building Code when stationary. Suffice it to say, an escalator remains an escalator even when it is stationary, and the Southern Standard Building Code has no application thereto. Other than his *ipse dixit,* Mr. Barnes furnished no basis for his opinion that a stationary escalator is subject to the specifications for a stairway contained within the Southern Standard Building Code. As a matter of law, this Court holds that his conclusion is erroneous.

His testimony regarding the need for some audible signal to warn store management of an escalator stoppage smacks of a products liability claim. As the Court noted in its earlier Memorandum and Order, any products liability claim is barred by Tennessee's Statute of Repose, Tenn. Code Ann. § 29-28-103. Further,

7

Proffitt's did not manufacture this elevator.

Mr. Barnes' testimony regarding the "wallpaper effect" is not supported by any independent research, nor did Mr. Barnes rely upon the research of another person whom Mr. Barnes determined to be both knowledgeable and reliable. His testimony that it is "well known" that stairways with risers of non-uniform height, and that stationary escalators used as stairways create disorientation are - again - merely unsupported conclusions.

Mr. Barnes' affidavit and deposition testimony do not pass muster under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrill Dowell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Although Mr. Barnes is an architect and undoubtedly a good one, nevertheless his testimony is not based on sufficient facts or data, and neither is his testimony the product of reliable principles and methods.

However, exclusion of Mr. Barnes' opinion is not determinative of this suit. Indeed, the "optical illusion" effect of an escalator (moving and unmoving), and the difference in height of the risers as the steps emerge from, and then re-enter, the machine at floor level, are so well-known that expert testimony is not needed to establish those facts and the effect thereof.[4]

It bears repeating that this is a *premises* liability suit, not a products liability suit.

---

[4]Proffitt's contends that the steps of this particular escalator had a coloration that minimized or eliminated any optical illusion. But for purposes of summary judgment, Mrs. Kilgore's assertion will be accepted as fact.

In Tennessee, the following principles apply in a suit based on claims of premises liability:

> (1) Business proprietors are not insurers of their patrons' safety;
> (2) They are nevertheless required to use due care under all the circumstances;
> (3) A business proprietor's liability in a premises liability case stems from the proprietor's superior knowledge of the condition of the premises;
> (4) In a premises liability case, a plaintiff must prove:
>   (a) the dangerous or defective condition was created by the owner or his agent; or
>   (b) if created by someone else, the owner must be shown to have actual or constructive notice that the condition existed prior to the accident;
>     (i) constructive notice can be established by evidence that the dangerous condition existed for such a length of time that the defendant-owner, in the exercise of reasonable care, should have been aware of the condition; or
>     (ii) constructive notice can be established by showing a pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence.

*Blair v. West Town Mall*, 130 S.W.3d, 761, 764-765, (Tenn. 2004).

It is this last factor – a pattern of conduct or recurring incident – upon which plaintiffs rely to establish their claim of premises liability.

As noted in the earlier memorandum opinion regarding Kone's Motion for Summary Judgment, escalators often cease operating; blown fuses, power failures, an overload of passengers, or simple mechanical failure cause them to stop. There is no dispute in this record that the escalators in Proffitt's store sometimes stopped. When they did, they often were restarted with the push of a button; when they would not restart, the service company (in this case, Kone, Inc.) was called to effect repairs. The

9

record also reflects that when an escalator could not be restarted, it was "roped off" to prevent patrons from using the escalator as a stairway. Of course, until barricaded in some fashion, people are going to use a stationary escalator as a stairway; this Judge has done so many times, and likely every lawyer in this case likewise has done so. Because people have done so, and doubtlessly will continue to do so, Mrs. Kilgore and her expert, Mr. Barnes, argue that Proffitt's, and presumably all establishments having escalators, should have audible warnings to signal store management that an escalator has stopped working to enable management to more quickly barricade the stalled escalator.

Assuming, without holding, that barricading an inoperable escalator is a prudent thing to do, the lack of an audible warning device is a "design defect" that implicates a products liability claim which, in this case, is barred by Tennessee's Statute of Repose, T.C.A. § 29-28-903. Moreover, as far as can be determined, there is no statute or regulation that requires such a device; *see*, e.g., ASME A17.1-1996. And, as noted, Proffitt's did not manufacture this machine. There is no dispute in this record that Proffitt's routinely barricaded inoperable escalators that could not be restarted. Of course, store personnel must have actual or constructive notice that an escalator is not operating before barricading it becomes a factor.[5]

Inasmuch as Proffitt's had no prior actual notice that the escalator had stopped,

---

[5]The lack of a signaling device has been discussed immediately above.

we turn to *constructive* notice of the escalator's condition and plaintiffs' argument that Proffitt's should have posted warning signs or barricaded the escalator. Since there is no evidence in the record that the escalator had been stopped for such a length of time that Proffitt's was charged with constructive notice on that basis, we must therefore turn to the "recurring incident" factor of *Blair, supra*. And, all other considerations aside for the moment, that would trigger three possible alternative courses of action by Proffitt's: (1) some sort of *automatic* barricading device similar to a railroad crossing gate, which is (a) patently unreasonable and (b) a products liability issue; (2) posting a guard at all escalators to instantly barricade them upon cessation of operation, which also is patently unreasonable; or (3) posting permanent signs warning customers to refrain from using a stationary escalator. The third alternative is not particularly onerous, but it begs the basic question: Is a stationary escalator a *dangerous* condition that implicates the "recurring incident" factor of *Blair*? Clearly, the recurring condition must be dangerous before there is any potential premises liability at all.

    Mrs. Kilgore alleges that the "optical illusion," coupled with the non-uniform height of the risers, caused her to become disoriented and fall. But she herself noted the optical illusion long before she reached the bottom of the escalator where she fell. And she had ridden escalators before; she had to know that the heights of the risers decreased to zero as the steps approached the floor level. Had she used due care for her own safety, she should have realized that the last step would be much shorter in

11

elevation than the earlier ones. But even if plaintiff's knowledge of the situation is removed from the equation, it is still impossible to find that a stationary escalator, used as a stairway, is dangerous. "Dangerous" is the word used in *Blair* and other Tennessee premises liability cases, but logically it must be read as "apparently" dangerous, i.e., that the dangerous condition was, or should have been, *recognized to be dangerous* by the owner. An ordinary stairway that complies with the Southern Standard Building Code is dangerous; all steps are dangerous, because people can and do occasionally fall down them, often resulting in injury or death. Steps cannot be made to be perfectly safe. A stationary escalator used as a stairway also is dangerous for the same reason, and admittedly somewhat more so due to the uneven risers at the top and bottom. But the danger is not of the type, nature, or extent that its use as a stairway should be characterized as perilous. In other words, using a stationery escalator is not *unreasonably* dangerous.

This Court's research turned up relatively few cases from across the country involving the use of a stationary escalator as a stairway. Several cases found negligence on the part of the owner when the plaintiff suffered a heart attack while ascending the stationary escalator; that of course has no application to the facts of this case. Other cases found liability for injuries to a passenger when the escalator had been stopped, but suddenly restarted without warning, causing the passenger to fall. See, generally, 2002 A.L.R. 5th 24, § 39. Two cases were found that involved

12

plaintiffs who tripped and fell while descending a stationary escalator, and neither found liability on the part of the owner. In *Auguste v. Montgomery Ward and Co.*, 629 N.E.2d 535 (Ill. Appeals, 1993), the plaintiff maintained that she stepped onto the top step of an escalator she did not realize was stationary; she claimed that she slipped and fell due in part to the uneven risers. The Illinois court held that there was no duty to warn the plaintiff that the escalator was inoperable; that its condition was open and obvious; that the owner had no duty to insure that the escalator was stopped in a "proper position"; that it is a matter of common knowledge that escalators are either running or they are stopped; that the position the steps are in when stopped is merely a "fortuitous circumstance" which the owner could not have been expected to guard against; and the owner's prior practice of placing signs that warned that the escalator was inoperable did not create a continuing legal duty to do so.

In *Schurr v. Port Authority of New York and New Jersey, et al.*, 307 A.D.2d 837, (N.Y. App. Div., 2003), the plaintiff claimed that she fell on the defendant's stationary escalator because of the uneven spacing of the risers. In an opinion noteworthy for its brevity, the New York court held that there was no evidence to warrant an inference that the stopped escalator posed a reasonably foreseeable hazard to individuals who chose to use the escalator as a stairway.[6]

---

[6] Interestingly, the dissent in the *Schurr* case argues that "accepted industry standards" required the risers be a uniform height, which of course is what plaintiffs' expert, Barnes, asserts. However, an escalator could not be an escalator if the risers were of the same height along its entire exposed length.

13

Having colored "demarcation lines" at the leading edge of the risers arguably would be a relatively minor thing to do to ameliorate to some extent the optical illusion phenomenon described by plaintiff. Indeed, such demarcation lines are now required by ASME A17.1-2000, § 6.1.3.5.6. However, these sections do not appear in ASME A17.1-1996, the version now in effect in Tennessee, thus rendering moot the question of whether colored lines should be painted on older escalators. And then, of course, there is the fact that Mrs. Kilgore noted the optical illusion before she had traversed much of the escalator. She had used escalators before and therefore surely knew that the steps decreased in height as they approached floor level before disappearing altogether. This, of course, is the rationale for the ruling in *Schurr, supra.*

This case has been both fascinating and difficult; the Court has struggled with the issue, primarily because of *Willoughby v. Montgomery Elevator Co.*, 87 S.W.3d 509 (Tenn. App. 2002). In *Willoughby*, plaintiff apparently tripped and fell while exiting an *elevator* because the elevator was not perfectly level with the floor. *Willoughby* was *not a premises liability case*; rather, the suit was filed against the company which was contractually obligated to service the elevator. The Court of Appeals held that Tennessee is a state which holds that the owners and operators of elevators "have an 'obligation to passengers on elevators . . . [that] is the same as that of common carriers to passengers and that they must use and exercise the highest degree of care and precaution'," citing *Southern Bldg. & Loan Ass'n v. Lawson*, 37

S.W. 86, (Tenn. 1896).

In *McCool v. Proffitt's Inc.*, 1999 WL 893831 (Tenn. App. 1999), the plaintiff claimed that she was caused to fall on an *ascending* escalator when it suddenly "lurched." Although the Eastern Section of the Court of Appeals primarily discussed other legal issues, it did mention the "highest degree of care and precaution" standard first broached in the *Southern Building & Loan Association* case and *assumed*, without explicitly so holding, that the same degree of care applies to escalators. The Court of Appeals ended its opinion stating that "a common carrier is not an insurer of a passenger's safety." *Id.,* at *3.

In *Vann v. Howell*, 1999 Westlaw 454628 (Tenn. App. 1999), the plaintiff filed suit against the owner of an elevator when she leaned against what she believed was the rear wall of the elevator but which turned out to be doors that suddenly opened, causing her to fall. The Court of Appeals held that the owner of the elevator had a legal duty to post a warning in the elevator that the rear wall in fact was a door that could open.

> A landlord who retains the control and management of an elevator provided for the common use of his tenants may be responsible for injuries to his tenants, their employees, and such other persons as may lawfully use the elevator. [Citation omitted].
>
> The landlord's duty includes the obligation to remove or warn against any dangerous condition on the premises of which landlord is aware or should have been aware through the exercise of reasonable diligence. [Citation omitted.] As this court noted in *Oates v. Glenstone Lodge, Inc.* . . . 1998 Westlaw 251763 (Tenn. App. May 19, 1998):

15

> Generally, [a] risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm. [Citation omitted].
>
> It appears foreseeable that persons entering the elevator would move to the back of the elevator, depending on the crowd on the elevator, and could be against the rear wall of the elevator, or, as in this case, the door of the elevator. The record reflects that there were no warning signs that the rear door was an operating door. It also appears from the record that the rear door could be locked, and that in fact the landlord had locked it for other floors on the building.
>
> In a few states, the owner and operator of an elevator also has a more stringent duty than that of reasonable care. [Citation omitted]. Tennessee is one such state . . . [citing *Southern Building & Loan Ass'n*].

1999 WL 454628, at *3, *et seq.*

The *Southern Building and Loan Association* case itself, which precipitated the "highest degree of care and precaution" standard, is puzzling. Although that phrase is used (page 87), the Tennessee Supreme Court expressly approved the trial court's charge to the jury which simply described the owner's "duty to keep its building and elevator in *reasonably safe condition, and the plaintiff's duty to exercise ordinary care for her own safety*." (Italics supplied.) *Id.*, at 87. The Supreme Court also approved the trial court's instructions that the plaintiff would be barred from recovery if her own negligence was the direct and proximate cause of her injuries. *Id.* The Court also discussed the effect of the plaintiff's *remote* contributory negligence. *Id.*, at 87-88. This language is suggestive of garden-variety negligence law in pre-comparative fault

16

days and seems to be inconsistent with some extraordinary duty of care. Nevertheless, looking primarily at *Vann v. Hall, supra*, for guidance, it appears that no duty upon the landlord arises unless there is a "dangerous condition on the premises of which [the] landlord is aware or should have been aware through the exercise of reasonable diligence." Moreover, *however a jurist might define "highest degree of care," that definition has no application in this case*; although the Eastern Section of the Tennessee Court of Appeals assumed that the same degree of care owed by owners of elevators applied to the owners of escalators, *McCool*, *supra*, this Court now holds that this standard does not apply to *stationary escalators* simply because a stationary escalator is not a "common carrier." Plaintiff here was using it as a stairway; she entered it on her volition, and she traveled its length under her own motive power, with her own senses. She was not a "passenger" on the escalator in the usual and ordinary sense of that word. *Willoughby*, and all the other cases discussed hereinabove regarding the high standard of care owed by common carriers to its passengers, simply do not apply to a stationary escalator. The *Schurr* case from New York, and the *Auguste* case from Illinois flatly held that a stopped escalator did not pose a reasonably foreseeable hazard to people who used it as a stairway. Similarly, this Court cannot find that a stationary escalator, used as a stairway, is a recurring dangerous condition under Tennessee law.

If there was legal precedent in this state that a stationary escalator is unreasonably dangerous when used as a stairway, that fact, coupled with the

17

*Willoughby-Vann* standard of care, would compel a different result. At the very least, an issue of fact would arise with regard to the duty of the owner to post signage warning patrons to stay off the escalator. But absent such precedent, this Court is left to its own devices and, as just discussed, this Court cannot find that a stationary escalator used as a stairway is unreasonably dangerous. In retrospect, in light of (1) the ubiquitousness of escalators, (2) the fact that escalators stop with some frequency, (3) the fact that people tend to use stationary escalators as stairways, and (4) the obvious interest of the State of Tennessee in settling this apparently novel issue of its tort law, this Court now wishes it had certified the issue to the Tennessee Supreme Court under Rule 23 of that Court. But too much time has elapsed to do so, at least at this trial level. If an appeal is filed, perhaps the Sixth Circuit Court of Appeals can be persuaded to do so.

In conclusion, the Court is of the opinion that the undisputed facts show no duty owed by Proffitt's to Mrs. Kilgore that was breached. Accordingly, the Motion for Summary Judgment filed by Carson Pirie Holdings., Inc., doing business as Proffitt's Department Store, will be granted.

SO ORDERED.

                                                s/ Dennis H. Inman
                                                United States Magistrate Judge